Good morning, everyone. Be seated. The first argued case this morning is No. 14-1011, JVC. We're going to admit one of my critics this morning. Oh, my goodness. I didn't have to admit. Yes, I did. Excuse me. A slight delay. Would you proceed to the bar, please? I'm very pleased to announce that we have an admission. And I invite Judge Reiner to move the admission. Yes, thank you very much. I move the admission of Keith Agari to the U.S. Court of Appeals for the Federal Circuit. And Keith has been my critic for the past year. The man that stands before you is a hard worker, a work ethic that bears out a great work product. I've seen that he's earned the respect of his fellow clerks, and that his time here has brought credit and respect to our court. I thereby move for the admission of Keith Agari. Thank you. Do I hear any objection to the grant of this motion? No, I would gladly join. In that case, it is my pleasure to grant the motion for your admission to the bar. Please proceed to the clerk who will administer the oath. Please raise your right hand. Do you solemnly swear that you will support yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the bar of the United States Court of Appeals for the Federal Circuit. Thank you, and welcome, Mr. Agari. Thank you very much. We proceed again to the evidence of the day. The first case again is number 14-1011, JVC Kenwood Corporation against Miro Incorporated. Mr. Finkel, please proceed. Thank you, Your Honors. May it please the Court. I am Evan Finkel, Counsel for Appellants at JVC Kenwood Corporation in this matter. The District Court's summary judgment of non-infringement below should be reversed for three primary reasons. The first is that the two-part test for patent exhaustion under QANTA was not met. The second is that JVC should have been allowed the opportunity to take discovery with respect to use of the accused neural software with unlicensed disks and with disks of foreign origin to which the patent exhaustion defense does not apply. And third, with respect to the release, the release applies only to pre-agreement activities if the same conduct post-agreement would have been protected under the patent exhaustion doctrine. So if there is a reversal with respect to patent exhaustion, it would necessitate as well a reversal with respect to the release. And why is it not protected under the exhaustion doctrine? I think, Your Honor, you have to break it down into the different patents. We can group four patents together, if you will. The 008, the 491, the 404, and the 881 patents. These patents taken together have a collection of claims that are directed to, first, methods of recording, video data, audio data, and corresponding control data onto a recording medium in a very precise way. But the license is unrestricted. You're saying that every customer must now go back and look at whatever patents may have been involved in the pool? What I'm saying, Your Honor, referring to the license agreements themselves, the license agreements are only for essential patents for the product being sold. What we've said in our papers is that the patents in question here and the claims in question here were not essential to a blank optical disk, like a piece of paper, so to speak, and therefore the product were not sold under a license under those patents. And so you're saying that they were not within either of the two pools? No, I'm not saying that, Your Honor. You're not arguing that because the optical disk itself complies with the standards. That's part of your theory of infringement. What I'm saying, Your Honor, is the optical disk may comply with certain standards, but not necessarily with the standards with respect to this patent. And the way the license agreement reads, the DVD license agreement, for example, But your theory is that the optical disk complies with the industry standards and your asserted patents are essential to those industry standards and therefore the implementation of those standards by the end user, the customer in this case, necessarily results in infringement of your patents. That's your theory. No, it's not, Your Honor. At least not as I understood what you said. I apologize. Our theory is that the Nero software practices the essentiality of these patents in recording information, in reading information, and so forth. That's what our claim is. You need something to write upon, for example. You need something to read from. But the disks are not just ordinary disks. They're manufactured and formatted in a particular way so that they can be used with the standards. Well, they're manufactured in accordance with a blank disk, is what we're talking about at the moment. Is your appeal limited to the blank disks? With respect to certain of the patents, it is in certain of the patents, but it's not, Your Honor. You have to break that up. But as to the blank disks, I mean, they aren't just ordinary disks. They are manufactured in a particular way to be formatted in connection with the industry standard. It's not as though it's an ordinary disk that then is used in some way together with the software to comply with the standard. The disk itself is prepared in a particular way, no? The disk has a certain physical format. That is correct. It doesn't have a certain logical format, which is what most of these claims are directed to. What do you mean, physical format? Well, I'll give you an example. There may be a two-layer disk, a dual-layer disk. There may be a certain reflective coating required for a disk, certain electrical characteristics of the disk. The pitch and lands is the way that you write to a disk. But your own expert said the disks were formatted in a particular way to comply with the standard, no? What the expert said was that the software writes it in a certain way to comply with the standard. No, I think he went beyond that, and he was talking about the manufacturer of the disk so that it could be used in connection with the industry standard. With respect to the physical layout of the disk, yes, but not with respect to the logical layout or the data that's written to the disk. But doesn't the physical layout of the disk mean that this is not going to be used for ordinary data storage? No, it does not. It does not mean that at all. What evidence is there that people purchase these disks for ordinary data storage? The issue with the quanta is whether they have reasonable or intended uses. No, but my question is what evidence was there that somebody actually purchased these disks or that any significant number of people purchased these disks for ordinary data storage? Well, Your Honor, that would go to the level of damage. So the answer is there's no evidence. Well, we're denied any discovery with respect to uses of the neural software with specific individuals, Your Honor. I mean, I think it's important to recognize. But you certainly could have come up in opposing summary judgment with an affidavit that said a lot of people buy these disks because they want to use them for ordinary data storage. There's nothing like that in here, right? That's correct, Your Honor. There's no testimony with respect to what people are using it out there for. It's not your theory of infringement limited to DVDs and Blu-rays? That's what the neural software writes upon, yes. And those are not normally data storage as just a regular CD? Well, a DVD is used for data storage, Your Honor. No, of course it is. I mean, you have to have data on it. But you're talking about a DVD player. You're talking about a Blu-ray. And your PANs, your asserted PANs, have particular functions that you claim are essential to the industry standards. Well, I'm saying that what I'm trying to say, Your Honor, is that that's the way the neural software writes. I'll give you a perfect example, if I may. There were two patents dealing with editing, like audio editing and things like that. That had nothing to do with the disk as sold. Nothing to do with the disk as sold. Well, how do we know that? The expert testified with respect to what performs these functions and how those functions work. Well, where does he say that these patents have nothing to do with the disk? Where does he say that the patents have nothing to do with the disk? I've read the affidavit. I don't see that he's saying that the patents have nothing to do with the way the disk is prepared. What he has said very clearly is that these disks, as you buy them as blank disks, have all these other uses, that they can be used for this, that they're intended to be used for this, is what he does say. He does say that, with respect to the quanta test, which requires a substantial embodiment of the invention, that all the key characteristics, all the key inventive features are in the software and not in the disk. I'm not sure that he says that. He seems to say, even he seems to say that the compliance with the standard is the result of a combination of the way the disk is prepared and the way the software operates on the disk. What he says is that you take a disk that has the concentric circles and so forth and so on, and you write this form of data to the disk. We appreciate this as summary judgment rather than findings. Is there any doubt that whether these disks comply with the standard? That's not an issue, is it? There's no question that the disks comply with a portion of the standard. When we choose the word generically standard, it brings in a host of different specifications and a host of different standards. So to say that this complies with the standard, Your Honor, kind of begs the question, which is what standard does it apply with? If I sell a disk and the standard says it must be a dual-layered disk having a certain reflectivity, yes, it complies with that standard. It doesn't comply with any standard with respect to what data you write to it, how you write the data to it, how you edit the data on the disk, how you fast-forward for data once you've written it to the disk, and so forth and so on. So it does, and that's why the patents, that's why the DVD license agreements and the Blu-ray license agreements don't speak in terms of you get a license for all these patents. What it says is you get a license for the patents that are essential to your product. So we understand that the industry pool has, let's say, many patents, many different uses for a disk. Yes, sir. And your argument is that we shouldn't find or hold in this case in such a manner that the disk complies with all of those standards, the entire universe. Correct? That's correct. But the problem here, not the problem, but it's your theory that has limited the universe of the standards that we're looking at. I mean, you've asserted patents, and those patents have specific methods to them. So you're the one that's limited the universe that we're considering. I'm not entirely sure I followed. Let me try to respond. We're saying that, for example, as we said in the brief, as we said in the other papers, there is a standard, for example, for a certain type of layout, as I said. And, for example, the Chain Declaration, which went through the essential reality reports that are published on the website of these DVD and Blu-ray organizations, say what they deem a patent essential for. These patents were not deemed essential for blank optical disks. Therefore, when somebody sells a blank optical disk— How do we know that, that they're not essential for the optical disk? I don't see in your affidavit a statement that the manufacturer of the disk has nothing to do with some of these patents, which seems to be what you're arguing. Your Honor— Am I missing something? Is there such a thing in these affidavits that the manufacturer of the disk has nothing to do with the patents you're talking about? The evidence before the Court is that the DVD— No, but try to answer my question. Is there something—have you submitted a declaration or affidavit that says that in manufacturing these disks that some of the patents have nothing to do with the way the disk is manufactured? Well, the declaration of the expert goes into what the patents relate to, and what the disk— No, no, no, but you've got to answer my question. I'm trying to. Is there something—if there is, show me—that says that with respect to some of these patents, the way the disk is manufactured is unaffected by standards compliance? The way the disk is manufactured is unaffected by—I'm sorry, Your Honor? By compliance with the standards reflected in the patents. I mean, you seem to be saying that some of these disks are manufactured in a way that has nothing to do with the standards, nothing to do with some of these patents. I'm saying it's interesting that you're saying that, but you're a lawyer, and where's the declaration that says that the disks have nothing to do with the patents? Well, I think there's two points I would make, Your Honor. We did submit the essentiality reports by the DVD at 60 and One Blue organizations that specifically go into what these patents mean. Should I then assume that the answer is no, that there isn't such an affidavit? No, I think the expert goes into that, Your Honor. Where? Show me where he says that the disk is unaffected by some of these patents. I'll give you one example, Your Honor, if I may. Take where he talks about Appendix 68— What volume we're talking about? I'm sorry, it's Appendix Number 6849. That's where the declaration is found. 6849. Volume 6, is that? Okay. In pages 6849 for the 008 Jump Reproduction Patent, Your Honor, the expert goes into detail as to what the claims the patent is directed to and as to what performs that function in the ERO software, and it's not something that's on the blank document. Well, what does he say that the disk has nothing to do with it? I don't see that. Well, he talks about storage areas on the disk. I mean, it seems to me that these disks are prepared in accordance with the standard so that they can perform, together with the software, the functions that are described in the patents, and I'm not seeing a place where it says that's not true. The disks are made in compliance with one of the standards, for example, on the physical layout of a blank optical disk, and it is intended for use with things for writing to the disk and so forth. But the QANTAS standard, which requires that the disk substantially embody that invention, is clearly not met because all the essential features of the claims are not in a blank optical disk. It's like a piece of paper. It's like a memory device. If you had patents on all memory devices and things that could be written to a memory device, it wouldn't cover necessarily a software program that you wrote to the memory device, even though it was, in a broad sense, intended to receive software and to store software in a certain way. But that specific software program would not be licensed. Same thing here. You have this blank object that's intended to be used for writing upon it, but what you write upon it is determined completely by the neural software. The content of what you write is determined by the neural software. But you can't just take an ordinary DVD blank disk and use the neural software on it, right? You can't. You put it in there. And your argument is once you do that, then you have a disk that complies with the standards. Once you've written it, you've complied with different portions of the standards. Right. Different portions. And your argument is it doesn't comply with the entire universe. That's the problem here. You're saying it only complies with a portion of it. But your theory of infringement identifies which portions because you've asserted patents and you've identified in your claims the standards that are essential, the claims that are essential to the standards. So you've identified which portion of the universe, of the industry standards, are infringing. We've identified evidence from the various standards as to why when the neural software is used with the disk, it infringes, yes. So your theory of the case is that the disk, when combined with Neuro, complies with the standards. When the neural software is used with the disk, yes, it complies with the standards. And so where does that leave the user, the ultimate user, as an infringer? The ultimate user who uses neural software to perform the functions and the claims is an infringer. Yes, Your Honor, a direct infringer. Well, just trying to see where this takes us, particularly when you look at the generality of the licenses that enable these patent pools, there is no indication that those who proceed through the pool and with products that are defined as essential for whatever it is, including selling and using the products, are infringing when they acquire the software that enables the patented process to occur from a purveyor other than a participant in the pool. And therefore, they're unlicensed. Is that where we're going with it? I'm not 100% sure that I understood the question, but let me try to respond to it. The license agreements specifically say, for example, the DVD license agreement, that you get a license for this blank optical disk or whatever product you take under the license for the essential patents only to that product, that's point one. And number two is the user specifically says it is not permitted to use that with unlicensed encoders, unlicensed decoders, unless they get a separate license and pay a royalty. So in that sense, it's right there in the agreement that the person signs. So they have to acquire not only the disk from a participant in the pool, but also the software for whatever new use someone might have. For use covered by various essential patents in the pool, yes. So if someone such as Nero creates a new use, not foreseen, not previously used, whatever it might be, find the depth of an ocean or whatever, that the ultimate user, the customer of an otherwise licensed DVD cannot acquire that software from Nero, they have to do what? They have to acquire it from some of our other licensees, for example. But if it's patented and it's not available, it can't be used? Let's say that Nero has patented their software separately, they tell us. And it's not included within the pool, because in theory it's not essential. Then the user would have to use a licensed software in order to practice those claims. Just like they would if it was a third party who wasn't part of the pool who had it. The user is not going to know. They never know. It's a very typical case. The user buys a product. It doesn't know if it's authorized to use this software or that software or the other software. When people purchase these discs, they're contemplating that they are going to be able to record and playback in accordance with the standards, correct? They're not authorized to do that. That is the understanding. When somebody buys one of these discs, they assume that they're going to be able to use it to do the record and playback for which the discs are designed, correct? There's no testimony in the record to that effect, there's no discovery. The license says seller used. Correct, it does say. The license to the DVD blank disc maker, is that what you're referring to, Your Honor? Well, the license that accompanies the participants of those who define their products is essential to the standard and therefore they're included in the pool. And the idea is to remove restraints in the question. I think we're struggling with is everything removed including separate inventions, which we're told we have here. Let's hear from the other side and we can pursue this further. We'll save you rebuttal time. Good morning, Your Honor. Adrian Preetz for the Appellee Bureau. I think it's important to note that this case involves only indirect infringement. Somehow that gets lost sometimes in the discussion that JBC creates around these patents. Well, it doesn't just involve indirect infringement in the sense that in order to have indirect infringement, there has to be direct infringement. And your theory is there's no direct infringement because as a result of the exhaustion doctrine, the users are authorized to use these discs in connection with the NERO software to perform functions in accordance with the industry standards, right? That's exactly right, Your Honor. And that's really where I was going. The primary issue on this appeal is whether the end user of a DVD or a Blu-ray disc who is using a disc, and all of these discs are licensed, as the court knows from our briefing, JBC did not produce even a single example of an unlicensed disc in use in the United States. But why does that license include, for example, some new imaginative, creative, and separately patented software? Well, I think the reason is really at the heart of the patent exhaustion doctrine. There's no question that all of the sales that took place in this case to end users are authorized sales. They're authorized sales of licensed products. Of the disc, not of your software. Of the disc. And the discs are fundamental to these patents. I mean, it's a license of the disc, but more than that, it's a license to use these patents in the disc. But not to use the idea, which also meets the requirements of patentability of the patent system. Well, I would disagree. You're saying once you buy the disc, you can use it not only for all of the purposes for which it's sold, and for all of the purposes that are defined in the license, but for anything else that someone invents 20 years later? Well, I think you can certainly use it for the purposes... No, you are not contending that. I mean, what you're saying is they're entitled to use the disc insofar as it's licensed in accordance with the industry standards, no? That's correct, Your Honor. And I believe that what JVC is actually arguing is not alternative uses to these standards, which is what it would have to argue, I think, to take it out of the standard. I think what they're arguing is that the end user can do anything it wants with the disc except use the patented features that they licensed for use in the disc. We think that's fundamentally wrong and fundamentally contrary to the patent exhaustion doctrine. JVC not only licensed its patents, all of these patents at issue, for use in the DVD and Blu-ray discs, they also had a series of some 23 individual licenses literally covering everyone who makes content-bearing DVD and Blu-ray discs and also what Mr. Finkel is calling blank DVD or Blu-ray discs. But I think as the panel pointed out earlier, these blank discs aren't really blank, and if you look at the patents that have been articulated, they specifically cover the formatting of discs that are used for recording content. That appears to be true to a significant extent. What troubles me is your complete failure to come up with declarations or affidavits in connection with your summary judgment motion, which would establish some of the necessary facts on which your motion is based. For example, there is no declaration saying that these discs have no reasonable alternative non-infringing use, which is probably the case, but I don't think we've established that in the record, have we? Well, I think we have, Your Honor, in this sense. We believe that Quanta and Footnote 6 talked about the fact that the reasonable and intended non-infringing use has to be the use. It has to be an alternative to practicing the patent. What we have pointed out is that JBC's position up to the summary judgment motion, and as reflected in its complaint, its infringement contentions, and its briefing, is that all of the patents at issue incorporate certain hard disc standards. For example, the 008 patent that Mr. Finkel was mentioning incorporates the DVD read-only format standards and the Blu-ray read-only format standards. I don't think you're really responding to my question, which is you haven't, it seems to me, entirely made the record that you need to make. You do not have a declaration from somebody saying that in the real world nobody would use these discs for anything other than functions that come within the standards. They are suggesting here that these discs could be used for ordinary data storage. That seems to me quite unlikely that somebody would buy one of these discs for that, but you're supposed to make a record, and it strikes me you haven't. Well, they have not supported that position, but I think the record that we have made is that there is no alternative to using the patented features. And one of the discussions that was had with Judge Gallagher You're not responding to my concern. I'm sorry. You have not made a record that these discs have no reasonable alternative use other than to be used in connection with the standards. Well, because we're looking at it a different way. We're looking at it from the legal point of view. There has to be an alternative. I think what the court is talking about is a reasonable use that isn't practicing the standard, but is something totally apart from it. For example, of the patents that cover the discs that have regional and parental control. You could not use reasonable and parental control, and you could do something else with that disc. But you don't have an alternative. That's non-use. And I believe under Quanta, under LifeScan, that this court recently decided, and I believe Your Honor wrote the opinion. I think you're missing the point. The point is not about the regional and parental control. The point is would somebody buy these discs for ordinary data storage? My guess is the answer is no. But you haven't made your record about that, so far as I can tell. Well, I think that our position on that would be that it wouldn't be relevant in this sense. That someone who buys an optical disc, that if you buy a disc that is authorized to be sold to you, you can use it for whatever functions you can use it for. But you also have a right to use the patented features in the disc that JVC licensed. And I think where... What evidence is there in the record that shows that the specific patents were used? Well, there's no evidence in the record to show that the specific patents were used with Nero software. That is correct. The case did not progress that far. I would make a comment on the discovery issue, though, that JVC was not denied discovery. And I think the record reflects that. It's a summary judgment, so there's very little evidence in the record. So I think you really need to convince us that on their theory of the case, nonetheless, they have to lose. Well, I think on their theory of the case, which is that a consumer, a purchaser of a DVD or a Blu-ray disc can do everything with the disc, except use the patented feature they licensed, is fundamentally the opposite of patent exhaustion law. In the real world, a consumer who buys a movie, a content-bearing disc, or who buys a disc, a rewritable disc to record to, expects to go home and to be able to record to that disc using the features of the disc. But you haven't even made a record about that, have you? That the person expects to be able to go home and use the disc for that purpose? Well, we made the record that they broadly license these discs for any application with no restrictions. So what I'm saying is coming from the other side. You're trying to expand QANTA beyond where it seems to me it goes. And in order to come within QANTA, you've got to make a factual record about the lack of alternative uses and the fact that the discs embody the essential features that are formatted in a particular way to make it possible to practice these patents. Well, I think that the infringement contentions that we submitted, that JVC created, rely entirely on the standards for formatting DVD and Blu-ray discs. That is the It's your burden to show that the NERO software when combined with the discs does not practice those standards. Even if the NERO software combined with the discs that are formatted and capable of and drive the use of these standards, even if that combination caused the end user to practice the standards, I don't believe they would be a direct the disc for its only reasonable and intended use is to practice the standard. There's no alternative to a standard. Well, I think that we've made the record by showing that JVC's entire case for infringement rests on the fact that it claims NERO software complies with the standard. And that's why I began by emphasizing that there's no direct that are described in the patents without an optical disc that is formatted. These are disc standards and they're disc patents. Every single patent that we're talking about requires an optical disc. And I think it falls directly requires something more than an optical disc, too. Yes, they certainly do. And that's kind of where I'm going here, is that they require very specific ordering and embedding of format and regions and tracks and things that are specifically, depending on the patent, they can be storage areas that are intended to enable fast forward or fast reverse. They can be storage areas and tracks and groupings that can enable parental controls or other things. But you don't even have an affidavit to that effect. I mean, that's very relevant. It's interesting. But you're standing up here as a lawyer and saying that and asking us to read the patents and agree with you. Whereas what you should have is an expert who comes in and says under these patents that you've got to prepare the discs in a particular way and that embodies the invention under the Qantas standard. You don't have that. Well, we relied and the court relied on JVC's repeated admissions that these specific patents were essential to these standards. And in fact, the NERO software, to the extent JVC is claiming that it, too, embodies these standards, as I think the panel has recognized, would not function with these discs unless the discs at the same time were also compatible. It's just a theory. And I realize the district court said, even if I buy your theory, JVC, if I buy your theory, I'm going to find exhaustion. But it's just a theory. And the case did not progress to a point to where there's actual evidence. Well, I think there is evidence, Your Honor. I think the evidence is the patents. I think the evidence is the contentions that the patents all cover discs that embed these standards. And where I think Qantas comes in and is really important here is that Qantas spent a lot of time talking about why method claims can be exhausted. And this is a prime case of that, where JVC cherry-picked a lot of method claims. All the patents have disc claims, but they cherry-picked a lot of method claims to try to say that the software is somehow performing a method apart from the novelty that is the disc. Well, the novelty runs throughout the patent, and there's overlap in these claims. But all of these claims require the use of Blu-ray and DVDs that are compatible with the very standards that JVC cites and that are specifically licensed by JVC. These patents were specifically licensed for use in the discs. And I do think it begs the question of when JVC says that, well, these discs, they're just pieces of paper, they have hundreds of licensees for these blank discs. They haven't made out the case that they're just ordinary discs or pieces of paper. But unfortunately for you, the burden on summary judgment is on you to bring forth the evidence that shows that you should win. Well, I thought we satisfied it by putting in all of JVC's admissions, their whole theory of the case, and infringement contentions, and the licenses themselves. And we submitted, of course, discs, which themselves have tracking and all of the features. We didn't want to reduce it to a battle of experts, and the court basically rejected the Eszedegan Declaration because coming as it did, after claim construction, after a motion on JVC's infringement contentions, and taking, you know, a hundred and eight, as I think Your Honor pointed out, the conclusions that are in the Eszedegan Declaration are fundamentally different from the fact that JVC's expert himself has attested to and put into the record. You're right. They didn't do their job, but neither did you. That's the problem. Can you comment on our case of Fujitsu versus Netgear, where we said that an accused product that operates in accordance with a standard, that you still have to have a claim-by-claim comparison? Well, we relied on Fujitsu v. Netgear when we went to the court to say, we don't think JVC's contentions, infringement contentions against Nero are adequate, because JVC is simply saying, Nero complies with the standard, without pointing out in the Nero software, where in the Nero software, what product, what part of the Nero software complied with the standard. JVC responded to that motion by saying to the court, you know, they have to comply with the standard because our patents embody the standard. Our patents embody the standard that anyone who makes a DVD or Blu-ray disc has to use, and that's the very standard that Nero's using. And they went on to say, I mean, contrary to the arguments that you're hearing now and that they made on summary judgment, they went on to say that all of these patents in this case were essential to practicing the standard, and that a user who played back or recorded to a DVD or a Blu-ray disc necessarily infringed their patent. I mean, this is the record that we have. So you're relying on Fitzhugh, and then you backed away from it after the court said, I'm going to buy the theory of infringement of JVC. So are you saying that Netgear doesn't apply anymore? Well, I would say that JVC's response to it made us move for summary judgment on patent exhaustion, that we said to the court, we believe we have a summary judgment on patent exhaustion. But what happens to Netgear? Well, it's JVC who is saying, we are admitting or claiming or stating that every one of these patents substantially embodies the standard, that every one of our patents is substantially embodied or embodied in these products that the end user is using with NERO software, and therefore that's why NERO is infringing. And we took their admissions, which I think we're entitled to do on summary judgment. We took the record that they made by insisting over and over again that their patents were essential to the standard, that end users, and they said this repeatedly. They did not say that they were essential to every element of the standards. Not every element of the standard in the sense that the standard is a very long thing. Well, if that's the case, shouldn't we still have a claim by claim review? It wouldn't be necessary because the part of the standard that's in these disks is what they say. The end user, this is the standard that when the, it's the standard that applies to the playback or the recording of DVD and Blu-ray disks. That part of the standard, JVC says, is necessarily infringed every time an end user, every time an end user plays or records to a DVD or optical disk. And that admission is throughout their papers in the court below. It's in their infringement contentions. If that's true, then patent exhaustion certainly applies here because they licensed all of these optical DVD and Blu-ray disks and the end users who purchased them certainly had a right to use them to play back and record to them without having to do the impossible, which is to wonder whether the software they're using is licensed and the hardware they're using is licensed by JVC. That's not something that occurs in the real world. I see that my time is up. Any more questions? Okay. Thank you. I won't burden the court too much because I am myself exhausted. But I would like to point out one thing the court has said a number of times, which is there's not much of a record. In fairness to a lot of it, there's not much of a record because there was no discovery. We're not talking about the other cases where... We didn't ask for discovery on the exhaustion question, did you? We asked for discovery on unlicensed disks, for example, Your Honor. Yes, you did ask for discovery on that, but not on the exhaustion question, right? Well, that's part of the exhaustion question, but the answer is yes. We didn't ask for discovery on how a disk operates or things associated with that. That's correct, Your Honor. You asked for discovery, but you made it pursuant to a motion and not pursuant to the rules of procedure 56C. I understand that, Your Honor. Again, we're here on summary judgment, so let's assume that the non-movement's position is accepted. Okay. Your Honor, I would point out that in the expert declaration we did submit, Ms. Dazadigan did testify, for example, that all the features of the method referring to the 008 patent are performed off the disk and the disk itself, whether prerecorded or not, has nothing to do with the essential features of the claim. That's at A6851. I would also point out that Dr. Dazadigan also declared at 6822 to 6823 that although a blank disk can be used to store a movie, the most common use of a blank DVD or BD disk is to store data in general, such as backup files, et cetera. So there is evidence to that effect. There's no contrary evidence, as Judge Dyke pointed out. They didn't produce any evidence with respect to this. The whole issue of summary judgment was very, very premature in this case. If we should agree somehow that somewhere along the way the summary judgment was improvidently granted, what would you propose to establish at some further proceeding? One, we would show that the neural software is used with unlicensed disks, or disks of foreign origin, and therefore, with respect to those operations, there can be no exhaustion. That's number one. Two, we would present more evidence with respect to what Your Honor has repeatedly said here today regarding other uses of these disks, making more concrete, if you will, that these disks have reasonable and intended non-infringing uses, and in fact are being used in such fashion. But wouldn't you also have to show that this particular use was unintended? Not that it's unintended. That's not the test, as I understand it, Your Honor. Quanta does not say that. Quanta speaks of... Quanta didn't have this situation either, exactly. Your Honor, yes, every case turns on its facts. But I'll take, for example, a life scan where the court said, I believe, that there was no other use that would not infringe. The court specifically made that point. In Univis, the court specifically... Intended use. Non-infringing use is what the court... But are you telling us the law should be that if there is some other unintended use, that the intended use is liberated from the restraints of the license? I guess I need to know what the court is referring to as an intended use of the product. It's not intended that it be used with unlicensed software like this. That's not what the intent is. And you're saying that if the use is contemplated generally in the patents that are deemed essential and announced as essential, they are not necessarily licensed or intended? If I understand the question, I agree with that, Your Honor. Because, as I say, the licenses... To me, it's very important to go back to the actual license agreements. Patent pools provide a very important function. They allow people to get together, put all their patents there, and allow somebody to come for one-stop shopping for their patents. But there's trade-offs in doing that and how you do it, the mechanics of it. It's not very easy. So what these organizations do is they say, okay, look, here's all my patents. Some are essential to this, some are essential to that, some are essential to something else. Here's my pool of patents. You want a license to take a particular product? Check it off. You can make that product, but you're only licensed under the patents that are essential to that product. When the manufacturer of the optical disc goes to that industry pool and says, I want to implement the patents to rewrite, and goes down the list, and makes that selection, and gets licenses, is that when, for example, JVC gets a royalty? They do not choose what patents. They choose what products. And they pay a fixed fee. Once they choose a product, and the patents are underneath that product, then they pay a fee. For that product, they pay a fixed fee. And what they're paying for, technically, is all the essential patents for that particular product. So if JVC's patents are in these products that are selected, then that's when you get your fee or your reward for the patent. To be honest, Your Honor, there's nothing in the record about the specific way the mechanics of the royalty allocations work in the DVD6C or the Blu-ray. But I guess I'm getting to the point that regardless of whether you have Nero software loaded onto the disc, once the disc is manufactured to comply with these standards, and you come along and you have essential standards in the industry pool for rewriting and these other functions, and those products are selected that incorporate your patents, you get a royalty at that time. But we get a piece of the royalty that the pool gets, Your Honor. There's a per-disc royalty, right? There's no evidence in the record, at least, Your Honor, and I don't want to misspeak, as to whether or not JVC would get any money for a disc that doesn't use any of its essential patents. For example, a product that doesn't use any of its essential patents. You're saying you don't get a license fee for these discs? I'm not saying that. What I said, Your Honor, was that there's nothing in the record with respect to how the allocation is done. So the license fee would be on the other patents that are essential to that disc, not on other patents that are not essential to that disc. That's not what we're being paid for. You're getting paid for inserting your patents into the, making them SEPs, or making them standard essential patents. And you agree that for this privilege of doing this, declaring my patents to be SEPs, I'm going to get a royalty every time another product comes along that utilizes my patents. Utilizing my essential patents for that product. So if you have a blank disc and the manufacturer has got to make the disc and make it in such a way so that it complies with the standard essential patents that are applicable to rewriting and rerecording and downloading movies and all of that, you've already gotten paid your reward at that point. I've gotten paid a reward on my essential patents for that particular product. Why does that exhaust your patents at that point? If you've gotten your reward and you've agreed, this is how I'm going to do it, because I'm going to declare my patents to be SEPs. Because I haven't declared them to be SEPs for those products, these other patents that we're talking about. And therefore I am free to assert those patents. Put it this way. Why would you be getting a license fee if the patents that were included in the pool have nothing to do with the discs? I'm not saying the patents in the pool as a whole have nothing to do with the disc. I'm saying these specific patents. And the problem that I'm having here, Your Honor, with all due respect, is we're lumping everything together. Here's my patents. They're all essential. And we're almost acting as if they're all essential for this one product. They're not. That's why you choose products. So you're saying that as to some of the patents, there's exhaustion, but not as to others? Is that what you're saying? What I'm saying, there may very well be patents that JVC has, there's no record of it, on that specific disc? At least as to some of the patents, the discs must be licensed under there. Otherwise there wouldn't be a royalty being paid. I mean, if they were just producing generic discs, nobody would be paying a royalty under your patents, right? They're paying a royalty under all the patents within the pool. And there's many patents that are essential to a blank disc. So, for example, if somebody was a software provider like Nero, and they had patents that were essential to the DVD standard, and they put it into the DVD form, they may not have any patents essential to a blank disc. Do you get royalty, part of a royalty, that's paid on these discs because of your ownership of these patents? I don't know the answer to that, Your Honor. You don't know because you say that there's a whole universe of patents within the industry standard. But wait a minute, this goes back to my very first question that I asked you. Aren't you the one that defines, by asserting specific patents, you're the one that's limiting the pull-down to certain patents? So the question is, do you get a royalty whenever a product comes along that uses the industry standard that you have in your different claims for, for example, the 08 and the 491, the jump reproduction functions, or the reproduction controls? Whenever any product comes along and uses those standards, you get a royalty. If the product uses those standards, we should get a royalty, yes. And you're claiming Nero, when you combine Nero and the optical disc, they're using my standards. That's why they infringe. Well, you've already been paid for that, haven't you? I don't believe we haven't paid for that, Your Honor. Okay, we'll have to figure it out. Thank you, Mr. Finkel and Ms. Phillips.